# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
v. ) I.D. No. 1504011040A
)
ATIBA MAYFIELD, )
)
Defendant. )

Submitted: April 4, 2025
Decided: April 25, 2025

*Upon Defendant Atiba Mayfield's Amended Motion for Postconviction Relief*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

Andrew J. Vella, Esquire, Chief of Appeals, DEPARTMENT OF JUSTICE, 820 North French Street, Wilmington, DE 19801, Attorney for the State of Delaware.

Herbert W. Mondros. Esquire, RIDGROSKY & LONG, P.A., 300 Delaware Avenue, Suite 210, Wilmington, DE 19801; Stephanie M. McArdle, Esquire, (*pro hac vice*) 220 North Jackson Street, Media, PA 19063, Attorneys for Defendant Atiba Mayfield.

**WHARTON, J.**

# I. INTRODUCTION

This case is before the Court on Defendant Atiba Mayfield's ("Mayfield") Amended Motion for Postconviction Relief ("AMPCR"). Mayfield was convicted at trial of Murder First Degree, two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), Conspiracy First Degree, Reckless Endangering First Degree, and Possession of a Firearm by a Person Prohibited. In a separate trial, his codefendant Michael Broomer ("Boomer") was convicted of Murder Second Degree, two counts of PFDCF, and one count of Reckless Endangering First Degree. Mayfield appealed his convictions to the Delaware Supreme Court. That Court affirmed the judgment of this Court.

Through counsel, Mayfield presents five claims: (1) Fraudulent Ballistics Examiner Carl Rone; (2) Failure to Perform Exculpatory GSR Testing; (3) Failure to Timely Disclose Immunity Agreement; (4) Ineffective Assistance of Counsel ("IAC") both at trial and on direct appeal; and (5) Mandatory Life without Probation or Parole Sentence. His IAC claim against trial counsel is subdivided into 11 alleged deficiencies. His IAC claim against appellate counsel, who was one of his trial attorneys also, has two allegations of ineffectiveness. The Court has carefully considered each claim. All are without merit. Accordingly, the AMPCR is **DENIED.**

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mayfield and his co-defendant Broomer were both charged with Murder First Degree and various other crimes in connection with the shooting death of Raekwan Mangrum ("Mangrum") on April 4, 2015 in Wilmington. The homicide was witnessed, at least in part, by Wilmington Police Officer Matthew Begany. Officer Begany heard what he thought were multiple gunshots while on patrol in the 800 block of West 4th Street.[1] He turned southbound onto Monroe Street and heard another round of multiple shots.[2] As he turned southbound, he observed a blue Ford Focus at the end of an alleyway between 2nd and 3rd Streets.[3] He also saw a man standing outside of the Focus firing a handgun.[4] Officer Begany wrote in his report that the man jumped inside the Focus, but when he testified at trial he acknowledged the man may have retreated down the alleyway.[5] He called for backup and drove down the alleyway toward the Focus and the man firing the gun.[6] The Focus began to head northbound towards his car and then turned suddenly onto a pedestrian alleyway, narrowly avoiding a collision.[7] At that point, Officer Begany saw two black males in the vehicle and broadcast the Focus' license plate over the radio.[8] He

---

[1] Trial Tr. at 59:20-23 (Jun. 21, 2016)
[2] *Id.* at 63:6-7; 64:3-11.
[3] *Id.* at 65:16-17; 66:20-23
[4] *Id.* at 66:23-67:4.
[5] *Id.* at 67:5-15.
[6] *Id.* at 8-10.
[7] *Id.* at 73:1-16.
[8] *Id.* at 74:3-75:21.

continued down the alleyway and observed Mangrum, who had been shot multiple times, a woman who had also been shot once in the leg, and her young child, who was not injured.[9]   The woman survived, but Mangrum died hours later at the hospital.[10]

After several Wilmington Police Officers spotted the Focus, a high-speed vehicle chase involving multiple police officers ensued.[11]   During the chase northbound on I-95, one of the officers observed a handgun being thrown from the passenger side of the Focus.[12]   A CZ .40 caliber semi-automatic firearm was recovered in the area where the officer saw a weapon being thrown.[13]   Ultimately, the chase ended in Pennsylvania where Broomer, the driver, and Mayfield, the passenger, fled on foot, but quickly were taken into custody.[14]   A .380 Cobra FS 380, with one spent casing and five live rounds of ammunition was also found along the path of the chase.[15]   Subsequent DNA testing established that Mayfield was the "major contributor" to DNA located on the grip of the .380 firearm.[16]   The police also recovered a box of .380 ammunition from under the driver's seat of the Focus and a spent shell casing under the passenger side floor mat.[17]

---

[9] *Id.* at 77:20-78:5.

[10] *Id.* at 85:15-86:6.

[11] Trial Tr. at 59:1-6; 61:23; 10-16 (Jun. 14, 2016).

[12] *Id.* at 73:18-74:4.

[13] *Id.* at 90:7-91:19; 163:8-165:20.

[14] *Id.* at 83:20-84:15; 85:20-87:2; 90:2-6.

[15] *Id.* at 171:18-172:2; 179:21-180:14.

[16] Trial Tr. at 52:17-54:1 (Jun. 15, 2026, AM).

[17] *Id.* at 72:3-17; 71:2-6.

At Mayfield's request, Wilmington Detective Robert Fox, the chief investigating officer, went to Ridley Township about nine hours after the shooting to speak with Mayfield.[18] There, Det. Fox conducted an audiotaped interview.[19] Mayfield confirmed that he requested to speak to Det. Fox, was read his Miranda rights and agreed to waive them.[20] At trial, the State played the audiotape for the jury.[21] Mayfield spoke to Det. Fox on two other occasions. The first was when he was taken to the Delaware County, Pennsylvania jail to await extradition to Delaware.[22] The second was in Delaware on April 16th at the Wilmington Police station after Mayfield had been returned to Delaware.[23] The State did not seek to introduce either of these two statements into evidence at trial.

Wilmington Police processed the scene in the 200 block of Monroe Street and collected ballistic evidence. Det. Hugh Stephy photographed and collected six .40 caliber shell casings from north of a manhole cover in the pedestrian walkway.[24] He also recovered two .40 caliber projectiles – one in the walkway and the other inside 220 Monroe Street.[25] Det. Stephy collected five 9mm shell casings as well.[26] The .40 caliber and 9mm shell casings were found in two separate clusters with all of the

---

[18] Trial Tr. at 191:13-192:7; 198:111-16. (Jun. 21, 2016).
[19] *Id.* at 197:16-20. App'x. to State's Resp., at B-278-351, D.I. 110.
[20] App'x. to State's Resp., at B-278, D.I.110.
[21] Trial Tr. at 201:21-22 (Jun. 21, 2016).
[22] AMPCR at 13, D.I. 100.
[23] *Id.* at 14.
[24] Trial Tr. at 101:18-108:19 (Jun. 15, 2016 PM).
[25] *Id.* at 111:19-23; 105:4-13.
[26] *Id.* at 118:9-10.

.40 caliber casings north of a manhole and all of the 9mm casings south of it.[27] Because the calibers are not interchangeable, all of the casings could not have come from the same firearm.[28]

Carl Rone ("Rone"), a forensic firearms examiner for the Delaware State Police testified for the State as a ballistics expert.[29] He examined both firearms that were recovered, and all of the .40 caliber and 9mm shell casings and projectiles.[30] He concluded that the .40 caliber handgun functioned properly and that it fired all of the .40 caliber shell casings found on Monroe Street.[31] He also concluded that the five 9mm casings were fired from the same firearm.[32] Finally, the Cobra .380 handgun did not properly feed cartridges into the chamber which required him to manually manipulate the weapon to seat a cartridge to fire.[33]

Since his testimony at trial, Rone has become a controversial figure. In May 2018, he was indicted on charges of Theft by False Pretense and Falsifying Business Records.[34] He later pled guilty to those charges.[35] The allegations involved Rone

---

[27] *Id.* at 118:4-17.
[28] *Id.*
[29] Trial Tr. at 121:14-23 (June 21, 2016).
[30] *Id.* at 130:8-131:23.
[31] *Id.* at 131:20-132:8.
[32] *Id.* at 132:9-16. The 9mm handgun was never recovered.
[33] *Id.* at 132:17-133:16.
[34] AMPCR, at 22, D.I. 100.
[35] *Id.*; State's Resp., at 26, D.I. 109.

falsifying payroll records and receiving pay for time when he was not working from 2016-2017.[36] The falsified records were not ballistics reports.[37]

Clothing was seized from both Mayfield and Broomer. Wilmington Police Master Corporal William Gearhart seized two sweatshirts and a pair of jeans from Mayfield.[38] He also took samples from Mayfield's hands to test for gunshot residue ("GSR").[39] He followed the same procedure with Broomer.[40]

Michael Gorski of the RJ Lee Group presented the results of his tests for GSR. Broomer's left palm sample yielded a single particle GSR characteristic while Mayfield had at least one particle of GSR on the fronts and backs of his left and right hands.[41] Additionally, he found significantly more GSR particles on Mayfield's sweatshirt than Broomer's.[42] No GSR particles were found on Broomer's glove.[43]

Until shortly before the homicide it appears Mayfield, Broomer, Mangrum, and Nicodemus Morris ("Morris") all had been on good terms.[44] But two incidents soured relationships among them. The first occurred on March 21, 2015. On that date, all four individuals were together riding around Wilmington in a car jointly

---

[36] *Id.*
[37] *Id.*
[38] Trial Tr. at 198:12-21 (June 14, 2016).
[39] *Id.* at 201:9-203:8.
[40] *Id.* at 205:5-8.
[41] Trial Tr. at 27:15-28:12 (Jun. 16, 2016 PM).
[42] *Id.* at 32:4-6.
[43] *Id.* at 20-23.
[44] Trial Tr. at 96:14-22; 156:18-21 (Jun. 16, 2016).

owned by Mangrum and Broomer.[45] When they stopped for gas, an argument over who was going to drive started between Mangrum and Mayfield.[46] The argument ended after Mangrum told Morris to drive to Mangrum's house where he retrieved a .380 handgun, and then to Windsor Street where Mangrum shot Mayfield in the leg.[47] The second incident involved bad blood between Mangrum and Broomer. Prior to both the shooting and the homicide, Broomer and Mangrum were arrested on felony drug charges.[48] At their joint trial, days before the homicide, Broomer testified that the drugs were Mangrum's, angering Mangrum and ending their relationship.[49] Mangrum began telling people, including on Facebook, what Broomer had done causing Broomer to be angry in return.[50]

Such was the state of things between Mayfield and Mangrum and Broomer and Mangrum on April 4, 2015. That afternoon, about an hour before the homicide, Mangrum, Morris and Tyezghaire Stevens ("Stevens"), and her young son met at the Fresh Grocer supermarket in Wilmington.[51] Mangrum and Morris were helping Stevens shop for groceries with her grandmother and sister.[52] After grocery shopping, Morris, Stevens, and her son walked to McDonald's on 4th Street, while

---

[45] *Id.* at 96:23-97:23.
[46] *Id.* at 98:3-14.
[47] *Id.* at 101:2-104:9.
[48] *Id.* at 108:6-18.
[49] *Id.* at 108:20-109:13; 155:19-156:2.
[50] *Id.* at 156:3-17.
[51] Trial Tr. at 6:19-7:4; 7:22-8:1 (Jun. 21, 2016).
[52] *Id.*

Mangrum went to his grandmother's house.[53] While headed to McDonald's, Morris saw Broomer at the drive-through.[54] Morris left McDonald's to tell Mangrum he had seen Broomer because he knew that there must be a reason Broomer was in the city and because he knew of the history between the two.[55]

Later, Stevens, her son, Morris and Mangrum all met in the alleyway on Monroe Street, a block from McDonald's.[56] Morris stood on the sidewalk and busied himself on his cell phone while Mangrum and Stevens flirted as Stevens' son played a short distance away.[57] Morris looked up from his phone and saw an arm with a gun come out of a car window.[58] He immediately ran to where he had secreted a 9mm Glock handgun.[59] As he was running, he heard 6-7 gunshots.[60] While Morris was returning, he saw Mangrum fall after being shot.[61] Morris stood next to Mangrum and fired what he thought were five rounds at the blue car.[62] He then noticed a police car at the end of the alley and fled because he was not legally permitted to possess a firearm.[63]

---

[53] *Id.* at 8:4-9; Trial Tr. at 86:21-89:16 (Jun. 20, 2016).
[54] Trial Tr. at 89:17-90:3 (Jun. 20, 2016).
[55] *Id.* at 94:6-95:5.
[56] *Id.* 65:9-12; 66:3-6; Trial Tr. at 11:23-12:7; 13:19-14:18 (Jun. 21, 2016).
[57] Trial Tr. at 68:3-20 (Jun. 20, 2016); Trial Tr. at 16:22-18:8 (Jun. 21, 2016).
[58] Trial Tr. at 69:14-18 (Jun. 20, 2016).
[59] *Id.*; 144:12-145:1.
[60] Trial Tr. at 73:17-74:9 (Jun. 20, 2016).
[61] *Id.* at 77:20-78:11.
[62] *Id.* at 78:17-21; 79:5-6.
[63] *Id.* at 79:2-5; 81:4-23.

Stevens had been talking to Mangrum when she heard shots and felt her leg.[64] She tried to get up but could not.[65] She was able to locate her son who appeared uninjured.[66] At first, she could not tell if Mangrum had been shot, but then she realized he had been hit.[67] After the shooting started, she saw the blue car that she had seen earlier at McDonald's.[68]

After a nine day trial, the jury returned verdicts of guilty as charged on all but the severed PDWBPP charge, which the State declined to pursue.[69] Mayfield was sentenced on November 4, 2016 to a term of life imprisonment without probation or parole on the murder charge, plus an additional five years at Level V on each of the other charges.[70]

Mayfield appealed to the Delaware Supreme Court, raising two issues both involving this Court's denial of certain jury instructions he requested.[71] One was based on various justification defenses.[72] The other was for lesser included offenses.[73] The Supreme Court affirmed on the basis of this Court's reasons stated in its rulings at the Prayer Conference.[74]

---

[64] Trial Tr. at 18:6-10 (Jun. 21, 2016).
[65] *Id.*
[66] *Id.* at 21:8-10.
[67] *Id.* at 21:11-23:20.
[68] *Id.* at 23:21-24:12.
[69] D.I. 35; Trial Tr. at 7:10-14 (June 24, 2016).
[70] D.I. 42.
[71] State's Resp. at Ex. A (Appellant's Opening Brief), D.I. 109.
[72] *Id.*
[73] *Id.*
[74] *Mayfield v. State,* 2017 WL 6015762 (Del. Dec. 4, 2017).

On October 4, 2018, Mayfield filed a *pro se* Motion for Postconviction Relief[75] and Motion for Appointment of Counsel.[76] Benjamin S. Gifford, IV, Esquire was appointed postconviction counsel.[77] On August 28, 2020, current postconviction counsel Herbert W. Mondros, Esquire substituted his appearance for Mr. Gifford.[78] Stefanie M. McArdle, Esquire was admitted *pro hac vice* as co-counsel with Mr. Mondros on October 12, 2020.[79] Both Mr. Mondros and Ms. McArdle were privately retained.[80] However, private funding eventually dried up and counsel applied to represent Mayfield as appointed counsel.[81] After a hearing at which the Court determined that Mayfield was indigent, Mr. Mondros and Ms. McArdle were appointed as counsel for Mayfield.[82] Appointed counsel ultimately filed this AMPCR motion on May 6, 2024.[83] The AMPCR included a number of IAC allegations. John S. Malik, Esquire, who was both trial counsel and appellate counsel, and Andrew J. Witherell, Esquire, who was trial co-counsel submitted separate affidavits in response to the IAC allegations.[84] The State answered on

---

[75] *Pro Se* Motion for Postconviction Relief, D.I. 59.
[76] *Pro Se* Motion for Appointment of Counsel, D.I. 60.
[77] D.I. 66.
[78] D.I. 82.
[79] D.I. 75.
[80] D.I. 83. Two copies of this motion have different docket item numbers. The copy incorrectly marked D.I. 81 is a complete copy. The copy correctly marked D.I. 83 is incomplete because only the odd numbered pages are copied.
[81] *Id.*
[82] D.I. 88.
[83] AMPCR, D.I. 100..
[84] Affidavit of John S. Malick, Esquire, D.I. 107; Affidavit of Andrew J. Witherell, Esquire, D.I. 106.

October 31, 2024.[85]  Postconviction counsel submitted a Reply to the State's Answer on April 4, 2025.[86]

### III. THE PARTIES' CONTENTIONS

The AMPCR raises five claims, one of which is an IAC claim.  That claim is subdivided into 11 allegations of ineffectiveness against trial counsel and two against appellate counsel.  Three claims relate to the prosecution function and the last claim to Mayfield's sentencing.

#### A.  Mayfield's Claims Related to the Prosecution Function

Mayfield's first claim is that the verdict was tainted by the fact that within five months of the Delaware Supreme Court affirming his convictions, Rone was charged with Theft by False Pretense and Falsifying Business Records.[87]  He notes the importance of Rone expert ballistics testimony at trial and contends that testimony is tainted by Rone's criminal misconduct.[88]

Mayfield's second claim is that the State failed to perform exculpatory GSR testing.[89]  Specifically, despite Det. Fox testifying at Mayfield's preliminary hearing that the State intended to send the bags that covered Mangrum's hands out for GSR testing, it never did.[90]  He claims the State had a fundamental discovery obligation

---

[85] State's Ans., D.I. 110.
[86] Def.'s Resp., D.I. 112.
[87] AMPCR, at 22, D.I. 100.
[88] *Id.* at 24.
[89] *Id.* at 26.
[90] *Id.*

to inform Mangrum's trial counsel of its decision to reverse course and not test the bags.[91]

The third claim Mayfield brings is an allegation that the State failed to timely disclose an immunity agreement it entered into with Morris on May 1, 2015.[92] The State did not disclose the agreement until Morris took the stand at trial, nearly 13 months later.[93] He argues that timely disclosure "would have changed the course of [defense counsels'] preparation of this case in many ways."[94]

### B. Mayfield's IAC Claims Against Trial Counsel

Mayfield's IAC claims represent the bulk of the AMPCR. He alleges that trial counsel: (1) failed to adequately investigate and prepare for trial, particularly in the areas of crime scene reconstruction and ballistics evidence;[95] (2) failed to move to suppress Mayfield's statements to police;[96] (3) failed to move to suppress evidence recovered from a search of Mayfield's room at his grandmother's house;[97] (4) failed to prepare and use expert witness Jeffrey Miller, who apparently did a crime scene reconstruction;[98] (5) failed to interview witnesses Tyrie Burton ("Burton"), who claimed to be an eyewitness, and Mayfield's younger brother Jowan Whitley

---

[91] *Id.*
[92] *Id.* at 28.
[93] *Id.*
[94] *Id.*
[95] *Id.* at 29-31.
[96] *Id.* 31-32.
[97] *Id.* at 33-35.
[98] *Id.* at 35-36.

("Whitley"), both of whom Mayfield claims would have provided exculpatory information, Mayfield's grandmother, and trial witnesses Brittany Mangrum and Dorothy Mangrum, who Mayfield claims counsel never interviewed before their testimony;[99] (6) failed to investigate the relationship between Broomer and Mangrum;[100] (7) failed to conduct independent GSR forensic testing which "would have likely produced exculpatory evidence;"[101] (8) failed to seek a favorable pre-trial resolution;[102] (9) failed to object to Det. Fox testifying as an expert regarding cell phone extractions;[103] (10) failed to prepare to use cell phone records of communications between Mangrum and Broomer leading up to the homicide;[104] and (11) failed to humanize Mayfield before the jury.[105]

### C. Mayfield's IAC Claims Against Appellate Counsel.

Mayfield makes two claims of IAC on direct appeal. He contends appellate counsel was ineffective in failing to appeal the trial court's denial of lesser included offense instructions and Det. Fox improperly testifying as an expert on cell phone extractions.[106]

### D. Mayfield's Sentencing Claim

---

[99] *Id.* at 36-37.
[100] *Id.* at 37-39.
[101] *Id.* at 39.
[102] *Id.* at 40.
[103] *Id.* at 40-41.
[104] *Id.* at 41-42.
[105] *Id.* at 42-42
[106] *Id.* at 44.

14

Mayfield argues that his mandatory life without parole sentence for his first degree murder conviction violate he 8th and 14th Amendments of the United States Constitution and the Delaware Constitution because he was a 21-year old with no prior violent history.

### E. State's Response to Mayfield's Claims Related to the Prosecution Function

In response, the State contends that a number of Mayfield's claims are barred by Rule 61(i). Specifically, it relies upon Rule 61(i)(3) to argue all but his IAC claims are barred and not subject to Rule 61(i)(5)'s exception.[107] Rule 61(i)(3) bars claims not raised in the proceedings leading up to the judgment of conviction unless Mayfield can show cause for the default and actual prejudice. The State contends Mayfield is unable to show either.

The State first addresses the Carl Rone issue. It downplays the importance of Rone's testimony and points out that Rone's crimes did not involve the mishandling of evidence or the falsification of documents related to his examination of evidence or his reports.[108]

As to Mayfield's claim that the State's failure to conduct GSR testing violated his due process rights, the State argues that Mayfield has no such right requiring the State to inform him that it would not be testing the bags on Mangrum's hands for

---

[107] State's Resp. at 20, D.I. 109.
[108] *Id.* at 26-32.

GSR.[109]  It also disputes Mayfield's conclusory allegation that the results of such testing would have been exculpatory.[110]

The State acknowledges that it did not disclose Morris' immunity agreement to the defense prior to trial.[111]  But, it maintains that Mayfield's trial counsel made effective use of it in attacking Morris' credibility on cross-examination and in argument.[112]

### F. State's Response to Mayfield's Claims Related to Ineffective Assistance of Trial Counsel

The State addresses Mayfield's IAC claims in sequence.  It contends where Mayfield does not establish IAC, his claims are barred by Rule 61(i)(3).  Further, in each instance, Mayfield failed to meet both the performance and prejudice prongs of *Strickland v. Washington.*[113]

First, the State  addresses Mayfield's claim that trial counsel failed to "investigate the physical evidence and forensics in the case" because the three different caliber guns in the case warranted crime scene reconstruction and ballistics analysis.[114]  State maintains that the record refutes this claim – trial counsel visited and examined the scene and engaged a crime scene analyst, Jeffrey Miller, to review

---

[109] *Id.* at 32-34.
[110] *Id.*
[111] *Id.* at 35.
[112] *Id.*
[113] 466 U.S. 668 (1994).
[114] State's Resp. at 36, D.I. 109.

16

the evidence.[115] Miller determined that the physical evidence did not support Mayfield's version of what happened.[116] Thus, Counsel was not ineffective for not utilizing him as a witness, and further, Mayfield has failed to state with particularity any prejudice. [117]

Mayfield next claims trial counsel was ineffective for failing to move to suppress his statements. The State argues that Mayfield has failed to "develop the claim beyond reciting the facts attendant to each statement and offers no legal basis upon which a motion to suppress would have rested."[118]

Mayfield claims that trial counsel was ineffective in failing to move to suppress a laser-sight for a handgun seized from his room at his grandmother's house and/or to move *in limine* to exclude it from evidence on other bad acts grounds. The State does not address the argument that a motion to suppress should have been filed, but does argue that the laser-sight was relevant and that there was no basis for a motion *in limine* because possession of the laser sight did not rise to the level of a bad act under DRE 404(b).[119]

---

[115] *Id.*
[116] *Id.* at 37.
[117] *Id.*
[118] *Id.* at 39.
[119] *Id.* at 42.

Mayfield's next IAC claim is that trial counsel failed to prepare and use expert witness Jeffrey Miller. The State points out again that the witness' testimony would not have helped Mayfield.[120]

Mayfield claims that trial counsel failed to speak to Burton and Whitley, who he contends would have provided exculpatory information about the homicide, and failed to meet with trial witnesses Dorothy Mangrum and Brittany Mangrum before they testified. The State contends that Mayfield has failed to proffer the exculpatory evidence that Burton and Whitley would have provided.[121] While it is true proffered exculpatory evidence was not set out in the body of the AMPCR, investigators' summaries of interviews of them are found in the Appendix to the AMPCR.[122] As to Dorothy and Brittany Mangrum, the State maintains that trial counsel did talk to them.[123]

The State next turns to Mayfield's claim that trial counsel failed to investigate the relationship between Broomer and Mangrum, their joint trial, and to present evidence of Mangrum's propensity for violence. But, according to the State, trial counsel were well aware of the relationship between Mangrum and Broomer and their joint trial.[124] Mayfield fails to specify what evidence in addition to what was

---

[120] *Id.* at 44.
[121] *Id.* at 47.
[122] AMPCR at Exs. 6 (Whitley) and 7 (Burton), D.I. 100.
[123] State's Resp. at 46, D.I. 109.
[124] *Id.* at 48.

presented at trial further investigation would have unearthed.[125] Regarding Mangrum's propensity, the State argues Mayfield has failed to identify that evidence with particularity and also failed to offer a theory for its admissibility.[126]

Mayfield's next claim is that trial counsel failed to conduct forensic testing. The State points out that, beyond the statement that additional forensic testing "would have likely produced exculpatory evidence" Mayfield offers nothing. The claim is conclusory and unsubstantiated and can be denied for that reason.[127]

Mayfield next alleges the trial counsel failed in their duty to seek a resolution of the case prior to trial. The State responds that Mayfield's postconviction counsel's "good faith belief" that plea negotiations did not occur has no basis in fact.[128] Further the State was not obliged to offer a plea and Mayfield has not stated he would have accepted one.[129]

Mayfield's next claim is that trial counsel failed to object to Det. Fox testifying as an expert regarding Cellebrite phone records extractions. The State notes trial counsel's strategic decision not to object to the extractions due the exculpatory nature of some of the records.[130] To the extent Mayfield argues that admission of the records violated his confrontation rights under the 6th Amendment

---

[125] *Id.* at 49.
[126] *Id.* at 49-50.
[127] *Id.* at 51.
[128] *Id* at 52.
[129] *Id.*
[130] *Id.* at 54.

and *Crawford v. Washington,*[131] the State argues that Mayfield did not develop that argument, and in any event, Det. Fox's testimony did not violate *Crawford* because he did not recount the statement of any non-appearing witness.[132]

Mayfield contends that trial counsel were ineffective in failing to use phone records provided in discovery to show a constant back and forth between Broomer and Mangrum and looked unprepared to address the cell phone evidence offered by the State to Mayfield's detriment. The State responds that trial counsel did introduce cell phone evidence in Mayfield's defense. It also argues that Mayfield has failed to make a concrete claim of prejudice and to substantiate it.[133]

Mayfield's final claim of ineffectiveness against trial counsel is that they failed to humanize him before the jury. He faults trial counsel for calling Mayfield by Mangrum's name four times in closing argument. The State responds by pointing out that Mayfield offers no authority for his contention that trial counsel was constitutionally ineffective in mistakenly confusing the names of Mayfield and Mangrum.[134]

**C. IAC Claims Against Appellate Counsel.**

Mayfield's first IAC claim against appellate counsel is that he failed to raise a meritorious issue on appeal by failing to appeal this Court's denial of his request

---

[131] 541 U.S. 36 (2004).
[132] State's Resp. at 54, D.I. 109.
[133] *Id.* at 58.
[134] *Id.* at 57.

for lesser included offenses. The State notes that appellate counsel did in fact raise that issue on appeal.[135]

His second claim of IAC against appellate counsel is that trial counsel failed to object to Det. Fox testifying as an expert witness on cell phone extraction evidence. In the State's view, the allegation is conclusory, and because he fails to identify the legal basis for his argument, he cannot demonstrate that it is clearly stronger than the issues appellate counsel raised.[136]

### D. Sentencing Claim

Mayfield argues that his mandatory life without parole sentence on his first degree murder conviction violate he 8th and 14th Amendments of the United States Constitution and the Delaware Constitution because he was a 21-year old with no prior violent history. The State argues that Mayfield's sentencing claim is conclusory.[137] It should be dismissed on that basis alone.[138]

### G. Mayfield's Reply

Mayfield's reply comes in six subsections: (1) the State is incorrect that certain of his claims are barred; (2) Rone's crimes require a new trial; (3) Trial Counsel's prejudicial IAC requires a new trial; (4) the legal standards governing effective assistance of counsel support a new trial; (5) trial counsel's affidavits raise

---

[135] *Id.* at 58.
[136] *Id.* at 59.
[137] *Id.* at 60.
[138] *Id.*

more questions than they answer; and (6) an evidentiary hearing is necessary to demonstrate trial counsel's ineffectiveness, the resulting prejudice, and to allow Mayfield to introduce evidence to support his claims.[139]

Mayfield challenges the State's contention that all but his IAC claims are barred under Rule 61(i). He suggests that it is inappropriate to apply the exceptions related to successive postconviction relief motions found in Rules 61(d)(i) or (ii) to his first such motion.[140] He points out that his first claim of error concerning Rone could not have been raised at trial or on direct appeal.[141] He claims that the failure to raise his second and third claims of error – the State's failure to conduct GSR testing of the bags on Mangrum's hands or to inform him of its decision not to do that testing and its untimely production of Morriss' immunity agreement – are attributable to trial counsel's ineffectiveness and excuse any default.[142] He also ascribes the failure to raise his sentencing claim to ineffective assistance of counsel.[143]

He insists Rone's testimony was critical to the State's case. He cites Rone's testimony regarding the inoperability of the .380 handgun, the fact that there were three guns at the scene with conflicting theories of "who shot who with what gun and from where," and the medical examiner's inability to identify the gun

---

[139] Def.'s Reply at 1-2, D. I. 112.
[140] *Id.* at 3.
[141] *Id.* at 4.
[142] *Id.* at 5.
[143] *Id.*

responsible for Mangrum's fatal injury to establish how critical Rone's testimony was.[144]

Turning to his ineffective assistance of trial counsel claims, Mayfield substantially repeats the allegations in the AMPCR. He emphasizes trial counsel's failure to file any motions to suppress: (1) Mayfield's original statement; (2) other bad acts relating to the firearm accessory found at his grandmother's house; and (3) pictures from Broomer's cell phone which Mayfield used.[145] He makes a new claim that had trial counsel had the bullet removed from Mayfield's leg when he was shot by Mangrum ballistically analyzed they "likely would have discovered that the same weapon Mangrum possessed on March 21, 2015 was the same weapon that he still had at the time of this shootout two [2] weeks later."[146] He makes another new claim that trial counsel should have conducted tests on the car which "likely would have had exculpatory evidence to prove their defense theory – this was a person-to-person fight when shots rang out and gunfire was exchanged across a parking lot and alleyway."[147] He reiterates claims he made in his AMPCR regarding what he considers the inadequacy of trial counsel's investigation and trial preparation, but does not address with any specificity the State's response to those allegations.[148]

---

[144] *Id.* at 7.
[145] *Id.* at 10-12.
[146] *Id.* at 12-13.
[147] *Id.* at 13.
[148] *Id.* at 13-19.

Mayfield's Reply contains 2 ½ pages discussing what constitutes effective assistance of counsel in criminal cases.[149] But, that terrain is well worn and the Court has travelled it many times.

Mayfield is unsatisfied with trial counsel's affidavits, insisting they raise more questions than they answer. He claims they do little to shed light on what strategy, if any, trial counsel employed in defending him.[150] He insists an evidentiary hearing is necessary to explore certain "discrepancies" in the affidavits.[151]

Mayfield requests an evidentiary hearing for other reasons as well. An evidentiary hearing is necessary to "resolve disputes over material facts, including the amount of time counsel spent with their client, their reasons for not filing motions, the investigation they did or did not do, to answer questions about their invoices in this case, and other things relevant to their performance in this matter."[152] It is also necessary to resolve the "dispute" over plea negotiations, and whether such negotiations were communicated to Mayfield, to present testimony from Burton, unnamed "police experts," investigators from True Blue Detective Agency, Morris, and Stevens to explore her bias and the "intricate contours of her relationship with the participants."[153]

---

[149] *Id.* at 19-22.
[150] *Id.* at 22.
[151] *Id.* at 23.
[152] *Id.* at 24.
[153] *Id.* at 24-27.

## IV. STANDARD AND SCOPE OF REVIEW

Before addressing the merits of a defendant's motion for postconviction relief, the Court must first apply the procedural bars of Superior Court Criminal Rule 61(i).[154] If a procedural bar exists, then the Court will not consider the merits of the postconviction claim.[155] Under Delaware Superior Court Rules of Criminal Procedure, a motion for postconviction relief can be barred for time limitations, repetitive motions, procedural defaults, and former adjudications. A motion exceeds time limitations if it is filed more than one year after the conviction becomes final or if it asserts a newly recognized, retroactively applied right more than one year after it was first recognized.[156] A second or subsequent motion is repetitive and therefore barred.[157] The Court considers a repetitive motion only if the movant was convicted at trial and the motion pleads with particularity either: (1) actual innocence;[158] or (2) the application of a newly recognized, retroactively applied rule of constitutional law rendering the conviction invalid.[159] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[160] Grounds for relief formerly adjudicated in the case,

---

[154] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[155] *Id.*
[156] Super. Ct. Crim. R. 61(i)(1).
[157] Super. Ct. Crim. R. 61(i)(2).
[158] Super. Ct. Crim. R. 61(d)(2)(i).
[159] Super. Ct. Crim. R. 61(d)(2)(ii).
[160] Super. Ct. Crim. R. 61(i)(3).

including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[161] The above bars to relief do not apply either to a claim the court lacked jurisdiction or to one claiming: (1) actual innocence; or (2) the application of a newly recognized, retroactively applied, rule of constitutional law rendering the conviction invalid.[162]

To successfully bring an ineffective assistance of counsel claim, a claimant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficiencies prejudiced the claimant by depriving him of a fair trial with reliable results.[163] To prove counsel's deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness.[164] Moreover, a defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.[165] "[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[166] A successful Sixth Amendment claim of ineffective assistance of counsel requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[167] An inmate must satisfy the proof requirements of both prongs to

---

[161] Super. Ct. Crim. R. 61(i)(4).
[162] Super. Ct. Crim. R. 61(i)(5), citing Super. Ct. Crim. R. 61(d)(2)(i) and (ii).
[163] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).
[164] *Id.* at 667-68.
[165] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).
[166] *Strickland*, 446 U.S. at 689.
[167] *Id.* at 694.

succeed on an ineffective assistance of counsel claim. Failure to do so on either prong will doom the claim and the Court need not address the other.[168]

In the appellate context, "[t]he [d]efendant must first show that his counsel was objectively unreasonable in failing to find arguable issues on appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."[169] Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."[170] Nonetheless, it is "still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."[171] A defendant faces a tougher burden of "showing that a particular nonfrivolous issue was clearly stronger than issues that counsel did present" where appellate counsel filed a merits brief, than in the case where appellate counsel filed a no merit brief.[172] Further, Mayfield must still show prejudice, "That is, [the defendant] must show a reasonable probability that, but for his counsel's unreasonable failure [to raise a clearly stronger issue], he would have prevailed on his appeal."[173]

---

[168] *Strickland,* 466 U.S. at 697; *Ploof v. State,* 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.").

[169] *Neal v. State,* 80 A.3d 935, 946 (Del. 2013) (quoting *Smith v. Robbins,* 528 U.S. 259, 285 (2000)).

[170] *Id.* (citing *Smith*, 528 U.S. at 288).

[171] *Id.*

[172] *Id.*

[173] *Id.* at 947 (quoting *Smith,* 528 U.S. 285).

## V. DISCUSSION

Before addressing the merits of Mayfield's AMPCR, the Court applies the procedural bars of Superior Court Criminal Rule 61(i).[174] If a procedural bar exists, then the Court will not consider the merits of the postconviction claim.[175] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[176] None of the bars to relief apply either to a claim the court lacked jurisdiction or to one claiming: (1) actual innocence; or (2) the application of a newly recognized, retroactively applied, rule of constitutional law rendering the conviction invalid.[177]

In his Reply, Mayfield now couches his claims regarding Rone, GSR, the late production of Morris' immunity agreement, and his sentencing claim in IAC terms in order to show cause for his failure to raise them previously since IAC claims are not subject to the procedural default of Rule 61(i)(3). As this Court has observed in *State v. Gattis*: "However, this path creates confusion if the defendant does not understand that the test for ineffective assistance of counsel and the test for cause and prejudice are distinct, albeit similar, standards."[178] For example the United States Supreme Court has held that:

---

[174] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[175] *Id.*
[176] Super. Ct. Crim. R. 61(i)(3).
[177] Super. Ct. Crim. R. 61(i)(5), citing Super. Ct. Crim. R. 61(d)(2)(i) and (ii).
[178] *State v. Gattis,* 1995 WL 790961, at *3 (Del. Super. Ct. Dec. 28, 1995).

> [i]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that the responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance;" Ineffective assistance of counsel then is cause for a procedural default.[179]

But:

> A movant who interprets the final sentence of the quoted passage to mean that he can simply assert ineffectiveness and thereby meet the cause requirement will miss the mark. Rather, to succeed on a claim of ineffective assistance of counsel, a movant must engage in the two-part analysis enunciated in *Strickland v. Washington* and adopted by the Delaware Supreme Court in *Albury v. State*.[180]

Accordingly, the Court discusses those four claims bearing in mind the "cause and prejudice" necessary to overcome 61(i)(3)'s bar to relief and *Strickland's* performance deficiency and prejudice requirements.

### A. Claim I – Fraudulent Ballistics Examiner Carl Rone

Rone's transgressions first came to light in 2018 in *Fowler v. State* [181] while Fowler's appeal from this Court's denial of his postconviction relief motion was before the Delaware Supreme Court.[182] They were unknown at the time of

---

[179] *Murray v. Carrier,* 477 U.S. 478, 488 (1986) (quoting *Cuyler v. Sullivan,* 466 U.S. 335, 344 (1980)).
[180] *Gattis,* 1995 WL 790961, at *4 (internal citations omitted).
[181] 194 A.3d 16 (Del. 2018).
[182] *Id.* at 17.

Mayfield's trial and direct appeal.[183] Since this issue was not raised before, Mayfield must show cause for relief from the procedural default bar of Rule 61(i)(3) and actual prejudice. Mayfield does not address the bar until his Reply, but the timing of the revelation of Rone's crimes is a sufficient cause for not raising the issue at trial or on appeal. Whether he is entitled to relief and was prejudiced requires the Court to examine the claim.

At trial in this case Rone offered expert ballistics testimony about the two handguns that were recovered – the .40 caliber and the .380 and multiple shell casings.[184] He matched all of the .40 caliber shell casings found on Monroe Street to the .40 caliber handgun thrown from the Focus during the police chase.[185] He concluded that all of the 9mm casings were fired from the same weapon.[186] Lastly, he testified that the Cobra .380 also recovered after the chase, did not properly feed cartridges into the chamber requiring him to manually manipulate it to seat a cartridge to fire.[187] The calibers of the shell casings recovered at the Monroe Street scene had been determined earlier by Det. Stephy.[188]

---

[183] Mayfield's trial was in 2016 and his convictions were affirmed in 2017. *See Mayfield v. State,* 2017 WL 6015762 (Del. Dec. 4, 2017).
[184] Trial Tr. at 121:14-23 (Jun. 21, 2016).
[185] *Id*. at 131:20-132:8.
[186] *Id.* at 132:9-16.
[187] *Id.* at 132:17- 33:16.
[188] Trial Tr. at 101:18-108:19, 111:19-23 (Jun. 15, 2016).

In *Fowler,* Rone testified that a single gun was used in two separate shooting incidents for which Fowler was charged.[189] This testimony was significant because "[T]he fact that ballistic evidence linked the same weapon to both incidents makes the evidence of Fowler's guilt in each separate incident mutually reinforcing" and supported the Court's finding that the State's failure to provide *Jencks* material for four witnesses to the defense was harmless.[190] After the Rone revelations, the State reversed field.

> Having argued below that its four *Jencks* violations were harmless in substantial part because of the ballistics evidence it presented, on appeal it did a 180. Now, it tells us that we need not worry that its ballistics expert has serious credibility issues because he claimed pay for work he did not do. Why? Because its witness testimony, including that of the four witnesses for whom it had failed to provide *Jencks* statements was so strong.[191]

In reversing, the Delaware Supreme Court held that "Rone's testimony was vital to both the State's trial case and the Superior Court's opinion because if one accepted the expert's testimony, that the same weapon was present at each incident, it gave the jury and the Superior Court a basis other than eye witness testimony to conclude that Fowler was the shooter."[192] In combination, the State's multiple *Jencks*

---

[189] *State v. Fowler,* 2017 WL 4381384, at *6 (Del. Super. Ct. Sept. 29, 2017)
[190] *Id.,* at 6-7.
[191] *Fowler v. State,* 194 A.3d at 17-18.
[192] *Id.* at 23.

31

violations and Rone's crimes were not harmless beyond a reasonable doubt and entitled Fowler to a new trial.[193]

Cases after Fowler have delt with Rone's trial testimony and subsequent criminal conduct. In *Thompson v. State*,[194] the Supreme Court observed:

> This is not the first case dealing with the fallout from Rone's arrest and conviction. A number of defendants have tried to use Rone's falsification of time sheets to upset convictions. But "every court" to consider the issue has concluded that "evidence that tends to impeach Rone's character is not a ground for invalidating a conviction unless Rone was 'vital' to proving the defendant's guilt." General character impeachment of Rone in this case was neither vital to Thompson's conviction nor does it suggest that Rone crossed the line from falsifying time sheets to providing a compromised expert report and testimony.[195]

Similarly, here the Court finds that Rone's testimony was not "vital" to proving Mayfield's guilt. It mostly either confirmed what was obvious – that the .40 caliber casings were fired from the .40 caliber handgun discarded by the Defendants as they fled police, or confirmed other testimony - that the 9mm casings came from the 9mm handgun Morris said he fired,[196] and that the .380 was inoperable as described by Det. Henry Law[197] and Mayfield himself in his first statement to Det. Fox.[198]  His

---

[193] *Id.* at 27.
[194] *Thompson v. State,* 296 A.2d 872 (Del. 2023) (internal citations omitted).
[195] *Id.* at 879-80
[196] Trial Tr., at 78:17-21; 79:5-6; 144:12-145:1.
[197] Trial Tr. at 81:11-12 (Jun. 15, 2016 AM) ("Yes – no, I'm sorry, I'm sorry, the .380 did not function.").
[198] AMPCR, at Ex. 9 at 15, D.I. 100 ("AM: I shot the .380 three times.  DF: Three times.  AM: And after that it didn't shoot anymore.").

one uncorroborated finding was favorable to Mayfield – that a 9mm casing found at the scene of the shooting at Mayfield's grandmother's house was fired by Morris' gun.

In *Fowler,* the Delaware Supreme Court articulated the unusual issues the case presented:

> Because of these new developments [Rone's arrest and the *Jencks* violation] Fowler sought leave to argue that he should receive a new trial during which Rone's credibility and reliability could be tested in light of this new information. That leave was granted and the key issues before us therefore are whether Fowler is entitled to a new trial because of (i) the confidence-undermining nature of the State's decision to indict its own expert, and (ii) the prejudice caused by the four *Jencks* violations.[199]

But, in reality, Fowler would never have gotten the chance to test Rone's credibility and reliability at a new trial. After all, why would the State call as its expert someone it had prosecuted for crimes involving dishonesty? It would not. Rone was not an eyewitness whose observations could not be replicated by a substitute witness. He conducted examinations of physical objects that remained in the State's custody and were available for re-examination. The State would do what it did in every other Rone case with which the Court is aware that went to trial. It would have the evidence re-examined by a different expert unburdened by Rone's baggage.[200]

---

[199] *Fowler v. State,* 194 A.2d at 22-23.
[200] Just as Mayfield proposed to have the ballistics evidence re-examined.

The Court assumes the State would submit the ballistics evidence to a different examiner in this case if the Court were to grant Mayfield's motion based on Rone's post-trial arrest and guilty plea. Rone would never testify at a re-trial of this case. All of the foregoing begs the obvious question – "Was Rone wrong?" The answer is that Mayfield has not given the Court any forensically based reason to conclude he was.

The Court concludes that this claim fails for two equal and independent reasons. First, Rone's testimony was not vital to proving Mayfield's guilt. Second, he has failed to challenge forensically the accuracy of Rone's testimony. As a result, he has failed to show he is entitled to relief and was prejudiced. At best, he has shown he would be able to impeach the character of a witness whose convictions occurred after his trial and will never testify at a retrial.

**B. GSR Testing.**

The State did not perform GSR testing on the bags that covered Mangrum's hands during his autopsy despite Det. Fox testifying at Mayfield's preliminary hearing that it would do so.[201] Mayfield contends he had a right to "rely upon the preservation and testing of this evidence" and that he should have been notified prior to trial that the State was not going to have the testing performed.[202] He claims this

---

[201] AMPCR at 26, D.I. 100.
[202] *Id.* at 27.

evidence was exculpatory and he was prejudiced by the State's violation of its "constitutional obligation to inform the defense of this change in course."[203]

Mayfield did not raise this claim either at trial or on direct appeal. Thus, it is procedurally defaulted under Rule 61(i)(3) unless he can show cause for relief from the default and actual prejudice. He has done neither. His assertion that a GSR analysis of the bags on Mangrum's hands would have produced exculpatory evidence is speculative at best. His argument that the State had a constitutional obligation to inform him that it did not intend to have the bags tested is unsupported by any citation to authority. This claim is procedurally defaulted under Rule 61(i)(3). To the extent he recasts it as an ineffective assistance of counsel claim in order to avert procedural default, he is unpersuasive for the reasons set out in section V.D.7, *infra*.

### C. Morris' Immunity Agreement.

The State entered into an immunity agreement with Morris on May 1, 2015, but did not inform Mayfield's defense counsel of it until Morris took the stand, an obvious discovery violation.[204] He alleges that "diligent defense counsel operating with adequate notice that one of the shooters had been given transactional immunity

---

[203] *Id.*
[204] *Id.* 28.

would have changed the course of their preparation in many ways."[205]  He does not say how.[206]

Mayfield did not raise this claim at trial or on direct appeal.  Thus, it is subject to procedural default under Rule61(i)(i)(3) unless he can show cause for the default and actual prejudice from it.  He has failed to do so.  Simply incanting ineffective assistance of counsel is insufficient to remove the procedural default bar.  *Strickland* requires that he demonstrate trial counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, there was a reasonable likelihood of a different result.  He must do more than allege that earlier production would have caused a change in trial strategy.  He must identify that change and how that changed strategy would have been effective.  Again, Mayfield has done neither.  Accordingly, he has shown no reason why the bar should not apply, and so, this claim is barred by Rule 61(i)(3) as well.

### D. IAC Claims Against Trial Counsel

Mayfield makes 11 IAC claims against trial counsel.  Rule 61 requires that a motion for postconviction relief "set forth in summary form the facts each of the grounds thus specified [in the motion]."[207]  A predicate for a successful IAC claim is that a defendant "must make concrete allegations of actual prejudice and

---

[205] *Id.*

[206] Interestingly, Mayfield does not allege that trial counsel failed to make effective use of the agreement in cross-examining Morris and in closing argument.

[207] Super. Ct Crim. R. 61(b)(2).

substantiate them or risk summary dismissal."[208] All of Mayfield's IAC claims fail to clear that hurdle. In the IAC context, Mayfield must show both that his trial counsel's performance was deficient and that such deficiency prejudiced him. Mayfield's IAC allegations are conclusory and lack substantial factual or legal support to establish that trial counsel's performance was deficient or he suffered actual prejudice.

### 1. Claim 1 – Failure to Prepare and Investigate

Mayfield identifies two critical factors in the case – crime scene reconstruction and ballistics evidence.[209] He asserts that it was critical for trial counsel to investigate the forensics in the case and provide the jury with a credible self-defense case.[210] The first part of that sentence undoubtedly is true. The second part depends on what the forensic evidence establishes. Mayfield acknowledges that trial counsel hired a crime scene and law enforcement investigations expert, Jeffrey Miller, M.S. ("Miller"), but fault them for not calling him as a witness at trial.[211] But Mayfield never makes any concrete allegation that he was prejudiced by Miller's absence from the witness stand. He never informs the Court of the helpful testimony Miller was prepared to offer.

---

[208] *Wright v. State,* 671 A.2d at 1356.
[209] AMPCR at 29, D.I. 100.
[210] *Id.*
[211] AMPCR at 30, D.I. 100.

On the other hand, trial counsel, John S. Malik, Esquire did discuss Miller's report in his affidavit. Mr. Malik quoted Miller as writing:

> The victim, Rae'Kwon Mangrum, has no evidence he was in a fight. He has no abrasions or contusions to his face, elbows, knees, or the knuckles of his hands. No witness describes two subjects fighting. In addition, Mangrum has numerous perforating bullet wounds. If he and Mayfield were in a fighting embrace when Mayfield was fired on by Nicodemus "Nick" Morris then Mayfield would have likely either been struck directly or by bullets exiting Mangrum's body. This forensic and pathological evidence is contrary to Mayfield's statement to Det. Fox during his interview.[212]

Mr. Malik concluded that Miller's opinion that the physical evidence did not support Mayfield's version of events "would not have been helpful for the defense at trial,"[213] certainly a reasonable conclusion. Not only has Mayfield has failed to substantiate this claim of actual prejudice, but he has failed to show that trial counsel's performance fell below an objective standard of reasonableness.

## 2. No Motions to Suppress Mayfield's Statement Were Filed

Mayfield gave three statements to the police, but only one was introduced into evidence. That statement was the one he gave to Det. Fox in Pennsylvania on the night he was arrested.[214] Mayfield does not specify any ground for suppression of that statement, nor does he cite any authority in support of suppression. Rather, he leaves the Court to infer one based on his claim that he gave the statement "after he

---

[212] Aff. John S. Malik, Esquire at 4 (June 18, 2024), D.I. 107.
[213] *Id.*
[214] Trial Tr. at 201:21-22 (Jun. 21, 2016).

38

sat for hours and while he was under the influence of benzodiazepines, and other drugs."[215] Leaving aside the question of whether he was still under the influence of drugs "after sitting for hours," Mayfield provides not basis to believe he was under the influence. Certainly, a review his statement does not. The only evidence Mayfield cites is the fact that benzodiazepines were found in the vehicle in which he was a passenger.[216] But, being in a car that had drugs in it is insufficient to raise an inference Mayfield was under the influence of those drugs hours later when he gave his statement.

Mayfield has cited neither facts nor law that would support a suppression motion. Trial counsel cannot be faulted for performance deficiency for not moving to suppress Mayfield's statement if postconviction counsel fails to supply any factual or legal basis for such a motion. Certainly he has given the Court no reason to believe a suppression motion would have had a reasonable likelihood of success. Further, Mayfield has not alleged that there is a reasonable likelihood the outcome of the case would have been difference had a suppression motion been filed. This claim fails both prongs of *Strickland.*

### 3. No Motions to Suppress Evidence from Search

During a search of Mayfield's room at his grandmother's house, the Wilmington Police recovered what appeared to be a laser sight for a handgun.[217]

---

[215] AMPCR at 31, D.I. 100.
[216] *Id.*
[217] *Id.* at 33.

Mayfield contends that trial counsel should have moved to suppress the laser sight because there was no evidence a laser sight was used in this case.[218] Alternatively, trial counsel should have moved *in limine* to exclude it as evidence of other bad acts.[219] He also argues that trial counsel should have filed motions to preclude the State from admitting other bad acts, "including photographs from a phone that depicted guns and an alleged plan to buy guns, as well as a scope to a firearm that was located on a search of Mayfield's grandmother's house."[220] Finally, he claims pre-trial motion practice would have put Mayfield in a better position to bargain for a more favorable resolution of the case.[221]

Mayfield's claims are entirely conclusory and lack any real legal analysis. The laser sight, which is a handgun accessory, was properly admitted as evidence that Mayfield had access to a handgun. Failure to object, therefore, was not performance deficiency. Further, Mayfield has not demonstrated how moving to exclude the laser sight from evidence would have resulted in a reasonable probability that the result of the trial would have been different. Moreover, his argument that pretrial motion practice would have put him in a better plea negotiating position is pure speculation. On this issue, Mayfield has failed to satisfy either of *Strickland's* prongs.

---

[218] *Id.*
[219] *Id.*
[220] *Id.* 34.
[221] *Id.*

#### 4. Failure to Prepare and Use Expert Witness at Trial

Postconviction counsel represents that they have reviewed potential defense expert Miller's files, diagrams, and reports and attached them to the AMPCR as Exhibit 13.[222] The documents are not attached. There is nothing behind tab 13.[223] They state that they have reviewed billing records and e-mail correspondence between Miller and the Office of Conflict Counsel and attached those documents as Exhibit 14.[224] But, Exhibit 14 is Miller's *curriculum vitae,* not billing records and e-mail correspondence.[225]

As discussed in Section V. D. 1., *supra*, Mr. Malik stated in his affidavit that Miller's assessment that the forensic and pathological evidence contradicted Mayfield's version of events as set out in his statement to Det. Fox. Declining to call an expert witness with that unhelpful opinion was a prudent decision and not performance deficiency. Although Mayfield states that Miller's work and diagrams would have supported Mayfield's defense, he offers no evidence of that conclusion. Mayfield fails to meet either *Strickland* prong on this issue.

#### 5. Failure to Interview Witnesses

Mayfield alleges trial counsel failed to interview five witnesses – two who testified at trial and three who did not.[226] The two who testified were Mangrum's

---

[222] *Id.* at 35.
[223] *Id.* at Ex. 13. Similarly, there is nothing behind tabs 4, 11, and 13.
[224] *Id.* at 35.
[225] *Id.* at Ex. 14.
[226] *Id.* at 36-37.

aunt, Brittany Mangrum, who was examined by Mr. Witherell, and his grandmother Dorothy Mangrum, examined by Mr. Malik.[227] The three who did not were Mayfield's younger brother Whitley; purported eyewitness Burton, and Mayfield's grandmother.[228] In the case of the testifying witnesses, Mayfield says, it is "clear" from the questioning that neither attorney had ever met their respective witness before the witness testified.[229] With respect to Mr. Witherell, what made it "clear" he had not spoken to the witness before was his apology for meeting her under the circumstances.[230] Beyond that, Mayfield offers nothing.

Both trial attorneys deny the allegation that they did not meet with the witness they examined before trial. Although, their recollections differ about the circumstances of the meetings. In his affidavit, Mr. Witherell states:

> Counsel did meet with the witness(es) in the office prior to being identified as witnesses to confirm their present recollection and testimony would be consistent with the prior statement provided to the police. Both witnesses were very consistent with the prior statements. Both were very credible in identifying Broomer as the shooter. Counsel had 'met' Brittany before and the use of the word 'meet' is being taken out of context.[231]

Mr. Malik states in his affidavit:

> Counsel recalls Mr. Monahan [a private investigator retained by the defense] accompanying both trial counsel to the scene of the shooting to photograph the area and to

---

[227] *Id.*
[228] *Id.*
[229] *Id.*
[230] *Id.*
[231] Aff. Andrew J. Witherell, Esquire at 4-5 (July __, 2024), D.I. 106.

conduct witness interviews. Counsel believes that Dorothy Mangrum was interviewed by Mr. Monahan during this visit to the crime scene with both counsel. Counsel believes that it was during this interview that it was confirmed that Dorothy Mangrum advised that she witnessed Co-Defendant Michael Broomer shoot her grandson Raekwon Mangrum. Counsel also believes that Mr. Monahan interviewed Brittany Mangrum who related that immediately after the shooting, she went to her nephew, Raekwon Mangrum, to help him at which time he declared that Co-Defendant Michael Broomer had shot him.[232]

Mayfield's subjective conclusion based on his interpretation of transcript is insufficient to outweigh the attestations of trial counsel. The Court finds no performance deficiency on either trial counsel's part. Importantly, Mayfield does not take issue with the substance of either witness' examination. Rather, he speculates that speaking to them earlier would have enabled trial counsel to help negotiate a settlement of the case. But, such speculation does not constitute actual prejudice under *Strickland*.

The Court now considers the three witnesses who were not interviewed. Mayfield does not inform the Court what testimony or information his grandmother would have provided. Accordingly, the allegation that trial counsel were ineffective in not interviewing her is without merit.

Whitley is Mayfield's brother. According to a summary of his interview with investigators Fontello and Workman of True Blue Detective Agency on March 11,

---

[232] Aff. John S. Malik, Esquire at 7-8 (June 18, 2024), D.I. 107.

2024, he is also Broomer's cousin because "Jowan's aunt adopted Broomer."[233] Mayfield claims his brother would have provided exculpatory information.[234] Whitley did not see the shooting, but was with Broomer earlier when they encountered Mangrum and Morris near McDonald's.[235] He provided some information about the "beef" between Mayfield and Mangrum as well as what appears to be hearsay information about a Glock .40 caliber handgun that Mayfield sold.[236] Mayfield does not explain why Whitley, his brother, did not volunteer this information to trial counsel. The Court finds Whitley had little if anything to say that was exculpatory, but the information about a .40 caliber Glock that Mayfield had possessed was potentially harmful. Further, it is not clear how trial counsel would have known Whitley had any information at all to provide. Under these circumstances, the Court finds no performance deficiency and no actual prejudice because Whitley was not interviewed by trial counsel.

Burton also was interviewed by investigators from True Blue Detective Agency. A summary of his interview is attached to the AMPCR at Exhibit 7. It appears that Burton first spoke to Mayfield while they were both incarcerated at Sussex Correctional Institution.[237] Burton claimed to have witnessed the shooting. In his telling, he was about 14 or 15 years old and was with his uncle (who is

---

[233] AMPCR at Ex 6, D.I. 100.
[234] *Id.* at 36.
[235] *Id.* at Ex. 6.
[236] *Id.*
[237] *Id.* at Ex. 7.

44

currently incarcerated out of state in federal prison) in a parking lot near where the shooting occurred.[238] He saw a man standing outside a black car parked in the alley pull a gun.[239] That man started shooting at the car, then ran through an alleyway and disappeared.[240] There was return gunfire from the car.[241] The man that started shooting was with the man who got shot.[242] He and his uncle ran to his grandmother's house in the 700 block of W. 2nd Street.[243] He has never spoken to the Wilmington Police or any investigators (presumably including any investigators for Broomer).[244]

It is difficult to ascribe performance deficiency to Mayfield's trial counsel for failing to locate Burton. He did not remain at the scene. He did not come forward later. The Wilmington Police did not know of him. Broomer's attorneys were unaware of him as well. Mayfield does not provide an answer as to how his attorneys were supposed to find him. Mayfield himself only became aware of Burton through a chance prison encounter. Further, while the substance of Burton's statement indeed is exculpatory, he is unlikely to be an unimpeachable witness, having remained silent for years and only telling his story after being incarcerated with Mayfield. His contention that the man with Mangrum (Morris) initiated the shooting

---

[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.*
[243] *Id.*
[211] *Id.*

by shooting at a car does not mesh seamlessly with the testimony of Brittany and Dorothy Mangrum that Boomer shot Mangrum, or Mayfield's own version that he was "tussling" with Mangrum when the shooting began.[245] Burton does not describe a fight occurring outside of the car, nor, in fact, does he describe any of the car's occupants being outside of it.[246] On balance, the Court does not find it a reasonable probability that Burton's testimony would have resulted in a different result. Accordingly, the Court finds Mayfield has failed to establish either *Strickland* prong regarding Burton.

### 6. Failure to Investigate Relationship Between Broomer and Mangrum

Mayfield states in his AMPCR that trial counsel were ineffective for failing to investigate the trial in which Mangrum and Broomer were co-defendants.[247] Had counsel investigated the trial, they "likely would have learned important information about the history and behavior of co-defendant Broomer and Raekwon Mangrum and the relationship between them."[248] He claims that had such an investigation been undertaken, it "would have provided important information towards preparing Petitioner's defense at trial, and would likely have put [him] in a better place in terms of negotiation. Unfortunately, Mayfield does not tell the Court just what "important information" trial counsel would have learned from the trial of Broomer and

---

[245] *Id.* at Ex. 9 at 2.
[246] *Id.* at Ex. 7.
[247] *Id.* at 37
[248] *Id.*

Mangrum, nor does he explain how this "important information" would have assisted in preparing his defense. It is impossible to give any weight to this portion of Mayfield's claim.

Mayfield also argues that trial counsel should have attacked Broomer's character in front of the jury. He does not explain what admissible bad character traits Broomer possessed, nor how attacking him would have benefited Mayfield. Again, this argument carries no weight.

Next Mayfield characterizes Mangrum as a "young man with a very long violent criminal history and faults trial counsel for not putting Mangrum's propensity for violence in front of the jury.[249] Mayfield apparently finds it unnecessary to share the details of that "very long violent criminal history" with the Court beyond the fact that the jury was already aware that Mangrum had shot Mayfield not long before the homicide. Nor he does provide a theory of admissibility in light of the fact that a victim's character is generally not an essential element of a self-defense claim and DRE 405(b)'s general prohibition against the admission of specific instances of conduct to show that a victim had a general propensity for violence.[250] Accordingly, Mayfield has not moved the ball towards either performance deficiency of actual prejudice with this argument.

---

[249] *Id.,* at 38.
[250] *Wright v. State,* 25 A.3d 747, 755 (Del. 2011).

Finally, Mayfield reviews the time records of both trial counsel. He makes no argument based on this review, however.

### 7. Trial Counsel Were Ineffective for Failing to Conduct Forensic Testing

Here, Mayfield notes evidence was produced at trial showing that Mayfield had the greatest concentration of GSR on him.[251] He argues that trial counsel should have requested independent forensic testing prior to trial, including unspecified testing of the Defendants' car and "bullets and shell casings".[252] He notes that were multiple guns and multiple people involved in this shooting incident, and then claims without any evidentiary support, "it [sic] who would have likely provided exculpatory evidence if the defense had in a timely manner requested defense testing."[253] This contention is nothing more than surmise

There were only three people from whom possible GSR samples could have been obtained for possible testing – Mayfield, Broomer, and Mangrum. Of those three, GSR testing was done on Broomer and Mayfield. Retesting those samples would have been pointless, as Mayfield admitted firing a gun in his initial statement to Det. Fox. Only the bags covering Mangrum's hands were not tested. His new contentions regarding testing the car and the "bullets and shell casings" raised for the first time in his Reply are to undeveloped and speculative to credit.

---

[251] AMPCR at 39, D.I. 100.
[252] *Id.*; Def's Reply at 12-13, D.I. 112.
[253] *Id.*

Curiously, postconviction counsel criticizes trial counsel for not conducting GSR and ballistics testing while failing to have it done themselves despite seeking delays in the case to have it done. On June 15, 2020, prior postconviction counsel, Benjamin S. Gifford, IV, Esquire, moved to stay the proceedings "based on the need to test bags that had been placed on the hands of Raekwon Mangrum to preserve forensic evidence after he had been fatally shot for the existence of gunshot residue."[254] Mr. Gifford retained McCrone Associates, Inc., a laboratory in Chicago, to conduct the tests, but was uncertain when the testing could be done.[255] On November 12, 2023, current postconviction counsel also requested a delay in order to retain forensic experts to conduct GSR testing prior to filing this AMPCR – "This extension request is based upon Petitioner's need to retain necessary forensic experts prior to filing his Amended Rule 61 Petition, so that claims are pled with sufficient particularity to demonstrate prejudice and the need for further fact development, or the granting of relief in this case."[256] Current post conviction counsel were communicating with potential expert witnesses requesting quotes for their services and with the Office of Conflicts Counsel to secure funding as of June 17, 2022.[257] On November 27, 2023, the Court granted Mayfield's Motion for 90 Day Stay to File Amended Rule 61 Petition so he could retain a ballistics expert.[258] Finally, on

---

[254] Def.'s Mot. to Stay Proceedings, D.I. 76.
[255] *Id.,* at 140.
[256] D.I. 83 at 1-2.
[257] D.I. 91.
[258] Motion, D.I. 94; Order, D.I. 95.

February 6, 2024, the Court signed an Order granting Mayfield's motion to transport two autopsy bags and one set of fingernail clippings to Microtrace Laboratories in Elgin, Illinois for the purpose of GSR testing.[259] In the end, the AMPCR contained no reference to these efforts, nor to any post-trial GSR or ballistics test results. Two reasons come to mind for this absence. Either no testing was done, or if tests were done, the results were unfavorable to Mayfield. If no testing was done, the AMPCR fails it explain how trial counsel were ineffective for not having independent forensic testing done but postconviction counsel are not. If testing was done and the results were unfavorable, postconviction counsel would be in no position to accuse trial counsel of ineffectiveness. The Court assumes the former to be the case.

Even if the bags were tested, the value of testing for GSR is uncertain. The GSR testing of the hands of both Mayfield and Broomer was done by "tabbing" their hands with sticky strips.[260] If there were GSR on Mangrum's hands, it is unclear how much, if any, would have been transferred to the bags. It is similarly unclear whether any potential GSR on his hands had been transferred to any other objects between when Mangrum was shot and his autopsy. It makes more sense for the police to have put the bags on Mangrum's hands to preserve his hands for future "tabbing," perhaps at autopsy, than to preserve the bags for future testing for GSR

---

[259] Motion, D.I. 96; Order, D.I. 97.
[260] Trial Tr. at 200:19-21; 202:17-23 (Jun. 14, 2026).

transferred to them from his hands. In other words, the utility of GSR testing of the bags on Mangrum's hands has not been established.

The Court concludes that this claim is conclusory as to both trial counsel's ineffectiveness and any actual prejudice Mayfield may have suffered.

### 8. Duty to Resolve Case Prior to Trial

Postconviction counsel represent that they have a "good faith belief that there was no pretrial negotiation to resolve this case."[261] Mayfield states that had trial counsel engaged in pleas negotiations, "they likely would have been able to resolve this case for a reasonable term of years.[262] Two problems with this claim are immediately apparent. First, postconviction counsel's "good faith belief" is not evidence of the claim, and second, Mayfield fails to inform the Court what plea to "a reasonable term of years," he would have accepted. There is no reason the believe the State would have agreed to what Mayfield deemed "reasonable." The Court finds this claim insufficient to allege both performance deficiency and actual prejudice.

### 9. Failure to Object to Det. Fox Testifying as An Expert

This claim consists of a mere three sentences. The first relates that in one of his many trips to the witness stand, Det. Fox discussed phone records extracted using Cellebrite.[263] The second states that Det. Fox testified that he had been trained in

---

[261] AMPCR at 40, D.I. 100.
[262] *Id.*
[263] *Id.* at 40.

51

extracting and properly preserving cell phone records.[264] The third states that Det. Fox testified he did not extract the information from the phone himself "although there was no defense objection based on Crawford and the 6[th] Amendment right to confront witnesses against him.".[265]

Det. Fox testified that in order to extract information from a cell phone:

> Basically what happens is you connect a power chord from the phone to the little computer, and a storage device, like a pen drive or a terabyte drive, to the other end of the computer. The computer reads the phone, tells you what kind of phone it is, and prompts you for a series of actions that you need to take in order to download the phone.
>
> After you perform these actions that you're prompted to perform by the computer, it extracts all the information on the – on the – from the phone onto your external drive. It includes pictures, text messages, SMS messages, Instagram, social media accounts, e-mail accounts, anything that's stored on the phone.[266]

This claim does not develop any argument that Det. Fox testified as an expert and the Court finds he did not. Despite being trained on extracting cell phone information from the phone using the Cellebrite computer, mechanically connecting the phone to the computer and following its prompts does not Make Det. Fox and expert.

The confrontation claim similarly is undeveloped. The Court finds Mayfield's confrontation rights were not violated. Det. Fox's testimony did not violate

---

[264] *Id.* at 40-41.
[265] *Id.*
[266] Trial Tr. 122:5-19 (Jun. 16, 2016).

*Crawford v. Washington's*[267] ban on the admission of testimonial statements of non-appearing witnesses because Det. Fox offered no such testimony. Moreover, according to trial counsel:

> [w]hether Detective Fox or another detective connected the cell phones in question to the Cellebrite program, the contents of the cell phones were produced in discovery and some of the cell phone records were introduced as exculpatory evidence during the course of the trial including text message exchanges involving Raekwon Mangrum shortly before the shooting transpired.[268]

Trial counsel made a strategic decision not to oppose the admission of the information.[269]

Neither allegation establishes performance deficiency by trial counsel. Neither allegation even attempts to demonstrate actual prejudice.

### 10. Failure to Prepare: Phone Records

Mayfield claims trial counsel was ineffective for failing to use certain phone records provided in discovery showing "a constant back and forth between Broomer and Mangrum in the hours and minutes leading up to the incident."[270] He claims that trial counsel was "woefully unprepared to deal with the cell phone records" to his prejudice.[271] The defense wished to introduce a summary of certain phone

---

[267] 541 U.S. 36 (2004).
[268] Affidavit of John S. Malik, Esquire at ₱ 4i, D.I. 107
[269] Affidavit of Andrew J. Witherell, Esquire at ₱ 4h, D.I. 106.
[270] AMPCR at 41, D.I. 100.
[271] *Id.*

records.[272]  Ultimately, the Court did not allow the introduction of the summary of the phone calls and text messages in the format proposed by the defense, but suggested that the parties reach a stipulation overnight.[273]  The parties did reach a stipulation which included a chart of cell phone transmissions and some additional testimony from Det. Fox.[274]  Mayfield contends that trial counsel were ineffective for failing to retain an expert to educate them on the cell phone records and possibly present testimony.[275]  But, Mayfield fails take into account that all of the conversation regarding a summary of the cell transmissions occurred outside the presence of the jury.

Again, Mayfield is unable to state the alleged performance deficiency with any particularity.  And, his allegation of actual prejudice is speculative.

### 12.  Failure to Humanize Petitioner Before Jury

During his summation, Mr. Malik misspoke and called Mayfield by Mangrum's name four times (although the AMPCR only cites to three times.)[276]  According to Mayfield, these slips of the tongue "disrespect[ed] both the deceased young man and his own client."[277]  He claims that "This fatal error by Malik should stand on its own as ineffective assistance at closing argument.  This abject failure by

---

[272] Trial Tr. at 153:10-17 (Jun. 22, 2016).
[273] *Id.* at 158:15-160:23.
[274] Trial Tr. at 3:4-49 (Jun. 23, 2016).
[275] AMPCR at 42, D.I. 100.
[276] *Id.*
[277] *Id.* at 42.

Malik also speaks to lack of a relationship between trial counsel and their of counsel and their client."[278]

Mayfield is engaging in hyperbole. Three (or four) slips of the tongue in a closing argument that lasted approximately 80 minutes[279] and spanned some 70 pages of transcript[280] in a 9-day trial hardly constitutes a "fatal error" or an "abject failure."[281] More importantly, Mayfield does not take issue with the substantive arguments Mr. Malik presented in his summation. Mayfield has failed to demonstrate either performance deficiency or actual prejudice in this IAC claim.

### E. IAC Claims Against Appellate Counsel.

Mayfield alleges two claims of IAC against appellate counsel. Both have no merit. The first alleges that appellate counsel failed to raise an argument regarding the trial court's denial of his request for lesser included offenses.[282] This claim fails because it simply is wrong factually. Appellate counsel did raise that issue.[283]

The second claim alleges appellate counsel was ineffective for failing to raise the issue of "Detective Fox improperly testifying as an expert on cellular phone extraction evidence."[284] Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the

---

[278] *Id.*
[279] Trial Tr. 57:23-58:1; 59:20 (Jun. 23, 2016).
[280] *Id.* at 59:20-129:5.
[281] How many parents have called one of their children by another child's name?
[282] AMPCR at 44, D.I. 100.
[283] State's Resp. Ex. A (Appellant's Amended Opening Brief), D.I. 109.
[284] AMPCR at 44, D.I. 100.

likelihood of success on appeal."[285]  A defendant faces a tougher burden of "showing that a particular nonfrivolous issue was clearly stronger than issues that counsel did present" where appellate counsel filed a merits brief, than in the case where appellate counsel filed a no merit brief.[286]  Further, Mayfield must still show prejudice, "That is, [the defendant] must show a reasonable probability that, but for his counsel's unreasonable failure [to raise a clearly stronger issue], he would have prevailed on his appeal."[287]  In Section V.D.9., *supra,* the Court found no merit to this claim. Mayfield has failed in his burden to show performance deficiency or prejudice in this IAC claim as well.

### F.  Mayfield's Mandatory Life Without Parole Sentence

This entire claim as stated in th AMPCR consists of a single sentence: "Mandatory Life Without Parole Sentences violate the 8th and 14th Amendments to the U.S. Constitution and the Delaware Constitution when imposed upon a 21-year old with no prior violent history."[288]  Because this claim presents no argument or authority to support it, the Court declines to consider it.  Even with the Reply's somewhat expanded argument, this claim is nothing more than wishcasting on Mayfield's part.  He does not cites to a single example of his contention being accepted anywhere. Were it to consider it, it would find it barred by Rule 61(i)(3).

---

[285] *Id.* (citing *Smith*, 528 U.S. at 288).
[286] *Id.*
[287] *Id.* at 947 (quoting *Smith,* 528 U.S. 285).
[288] AMPCR at 45, D.I. 100.

### G. Mayfield's Request for an Evidentiary Hearing.

The Court has carefully considered all of Mayfield's claims and his arguments in support of his request for an evidentiary hearing. The Court is not convinced such a hearing is necessary. The Court finds no utility in flyspecking trial counsel's billing records, or cross-examining them about their investigation and trial strategy, including their decision not to file pre-trial motions. None of that would change the fact that Mayfield has failed to demonstrate that trial counsel's performance, which the Court witnessed firsthand, would have fallen below an objective standard of reasonableness or that there was a reasonable likelihood that a different result would have occurred at trial. Nor would the testimony of investigators from True Blue Detective Agency or Burton. Presumably, Mayfield identified any significant issues discovered by his investigators and presented them in his AMPCR. The Court is not persuaded that any of the are significant enough to warrant granting Mayfield relief. As for Burton, hearing from him would not remove the significant impeachment baggage his testimony would carry. Mayfield has presented no persuasive reason to re-litigate the testimony of Morris and Stevens. Finally, the Court finds claims raised by Mayfield for the first time in his Reply to be untimely and speculative.

# VI. CONCLUSION

For the reasons set forth above, Defendant Atiba Mayfield's Amended Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.